**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| LANA ZINGER, on behalf of herself, all others similarly situated, and the general public,<br><br>    Plaintiff,<br><br>              v.<br><br>BAI BRANDS, LLC,<br><br>    Defendant. | Case No.: 1:24-cv-03993<br><br>Hon. Arun Subramanian<br><br><br>ORAL ARGUMENT REQUESTED |

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

REDACTED FOR PUBLIC FILING

Cheryl A. Cauley (*pro hac vice*)
BAKER BOTTS L.L.P.
1001 Page Mill Road
Building One, Suite 200
Palo Alto, CA 94304-1007
Tel: (650) 739-7557
cheryl.cauley@bakerbotts.com

Monica H. Smith (*pro hac vice*)
BAKER BOTTS L.L.P.
2001 Ross Avenue, Suite 900
Dallas, TX 75201-2980
Tel: (214) 953-6929
monica.smith@bakerbotts.com

Christina A. Romak
BAKER BOTTS L.L.P.
30 Rockefeller Plaza
New York, NY 10112-4498
Tel: (212) 408-2663
christina.romak@bakerbotts.com

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................ 1

II.     FACTUAL BACKGROUND .............................................................................. 3

    A.    Erythritol is a naturally occurring sugar alcohol, as Plaintiff admits. ................... 3

    B.    Plaintiff contends that any sweetener is "artificial" if it is "commercially produced," even if it is derived from natural sources and occurs naturally............ 3

    C.    Plaintiff's survey shows that consumers are inclined to change their minds with small differences in how the same sweetener is described............................ 4

    D.    Plaintiff's damages survey does not isolate a price premium specific to Plaintiff's theory of liability...................................................................................... 5

    E.    Bai's survey establishes that the challenged claim has no impact on consumer purchasing intent....................................................................................... 7

III.    LEGAL STANDARD ......................................................................................... 9

IV.     ARGUMENT ....................................................................................................... 10

    A.    The Court should grant summary judgment because Plaintiff has failed to introduce evidence that the "No Artificial Sweeteners" claim deceives consumers. ........................................................................................................ 11

        1.    Plaintiff cannot rely on the Denove Survey as evidence of consumer deception because it is biased, leading, and does not test how consumers interpret the "No Artificial Sweeteners" claim............................................. 12

        2.    The remainder of Plaintiff's evidence is inadequate or inadmissible and cannot raise a genuine dispute of material fact regarding deception............ 15

    B.    The Court should grant summary judgment because Plaintiff has failed to raise a genuine dispute of material fact that the "No Artificial Sweeteners" claim is material to consumers................................................................................ 17

        1.    Plaintiff lacks evidence to show that the "No Artificial Sweeteners" claim is material to consumers.................................................................. 17

        2.    Bai's evidence shows that the "No Artificial Sweeteners" claim is not material to consumers. ..................................................................... 19

    C.    The Court should grant summary judgment because Plaintiff has failed to present evidence that raises a genuine dispute of material fact that consumers suffered any injury. .............................................................................. 20

    D.    The Court should grant summary judgment on Plaintiff's individual claims....... 23

V.      CONCLUSION .................................................................................................... 24

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ..................................................................................................10

*Andrews v. Sazerac Co., Inc.*,
No. 23-CV-1060 (AS), 2025 WL 1808797 (S.D.N.Y. July 1, 2025) ......................20

*Brady v. Town of Colchester*,
863 F.2d 205 (2d Cir. 1988) .......................................................................................9

*Bustamante v. KIND, LLC*,
100 F.4th 419 (2d Cir. 2024) ........................................................................11, 14, 15

*Crawford v. Franklin Credit Mgmt.*,
758 F.3d 473 (2d Cir. 2014) .....................................................................................10

*Davis v. New York*,
316 F.3d 93 (2d Cir. 2002) .......................................................................................10

*de Lacour v. Colgate-Palmolive Co.*,
No. 16-CV-8364, 2024 WL 36820 (S.D.N.Y. Jan. 3, 2024), *appeal dismissed*, No. 24-331,
2024 WL 3678389 (2d Cir. May 16, 2024) .........................................................11, 12, 15, 16

*In re 5-Hour Energy Mktg. & Sales Pracs. Litig.*,
No. 13-ML-2438, 2017 WL 2559615 (C.D. Cal. June 7, 2017).........................19, 22

*In re ConAgra Foods, Inc.*,
90 F. Supp. 3d 919 (C.D. Cal. 2015) .....................................................................21, 22

*In re Gen. Motors Ignition Switch Litig.*,
407 F. Supp. 3d 212 (S.D.N.Y. 2019)....................................................................20, 21

*In re KIND LLC "Healthy & All Natural" Litig.*,
627 F. Supp. 3d 269 (S.D.N.Y. 2022), *aff'd sub nom. Bustamante v. KIND, LLC*, 100 F.4th
419 (2d Cir. 2024).........................................................................10, 11, 13, 14, 17

*In re Sling Media Slingbox Advert. Litig.*,
202 F. Supp. 3d 352 (S.D.N.Y. 2016).......................................................................17

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986) ..................................................................................................10

*Opperman v. Kong Techs., Inc.*,
No. 13-CV-00453, 2017 WL 3149295 (N.D. Cal. July 25, 2017).............................22

ii

*Reyes v. Upfield US Inc.*,
No. 22-CV-6722, 2025 WL 786656 (S.D.N.Y. Mar. 12, 2025) ............................11, 15, 20, 23

*Rivera v. Navient Solutions, LLC*,
No. 20-CV-1284, 2020 WL 4895698 (S.D.N.Y. Aug. 19, 2020) ............................................23

*Zakaria v. Gerber Prods. Co.*,
No. 15-CV-200, 2017 WL 9512587 (C.D. Cal. Aug. 9, 2017), *aff'd*, 755 F. App'x 623 (9th
Cir. 2018) ...................................................................................................................20, 21, 23

**OTHER AUTHORITIES**

Fed. R. Civ. P. 56(a) .................................................................................................................9

## I.    INTRODUCTION

Plaintiff, on behalf of the purported class and herself as an individual, filed a complaint against Bai Brands, LLC ("Bai"), alleging that Bai deceived New York consumers by claiming that its Bai Waters contained "No Artificial Sweeteners."  Plaintiff alleges that the claim is deceptive to a reasonable consumer because the Bai Waters contained erythritol, which she says is "artificial" because it is commercially produced, even though it is found in nature.  However, Plaintiff's claims fail, and summary judgment should be granted, because she has not set forth any admissible evidence showing that there is a genuine issue of material fact as to three essential elements of her claims—deception, materiality, and injury—any of which is sufficient to grant summary judgment.

*First*, Plaintiff cannot establish that the "No Artificial Sweeteners" claim was deceptive to a reasonable consumer.  Plaintiff relies on her expert Chris Denove, a mock trial consultant whose survey (the "Denove Survey') purports to show that a "majority" of New York consumers believe that erythritol is artificial.  Given Plaintiff's lack of other admissible evidence, Plaintiff must rely on the Denove Survey to show deception sufficient to survive summary judgment.  However, the Denove Survey is unreliable, as explained at length in Bai's Motion to Exclude Mr. Denove and in Bai's Opposition to Plaintiff's Motion for Class Certification.  The Denove Survey, rather than testing actual consumer perception, simply seeks to validate plaintiff's contrived theory of liability.  The Denove Survey inappropriately leads consumers to focus solely on the "manufacturing process" of an ingredient in deciding whether or not it should be considered artificial, and provides no evidence that consumers actually use the "manufacturing process" to decide whether an ingredient is artificial.  At best, the Denove Survey shows consumers can believe any sweetener is artificial based on the specific language used to describe its production process.  The Survey thus fails to determine how consumers interpret and understand the phrase

1

"No Artificial Sweeteners."  Any remaining evidence proffered by Plaintiff—via her own testimony and online articles—is anecdotal and insufficient to show the class was deceived.

*Second*, Plaintiff cannot establish that the "No Artificial Sweeteners" claim was material to consumers.  Plaintiff offers no reliable evidence that the "No Artificial Sweeteners" claim drives consumers' purchase behavior.  In fact, the survey conducted by Defendant's expert, Dr. Itamar Simonson (the "Simonson Survey"), is the only survey in this case that tests consumer purchase intent of the Bai Waters with and without the challenged claim, and it shows that the "No Artificial Sweeteners" claim has *no impact* on purchase intent.

*Third*, Plaintiff cannot establish that the class—or she as an individual—was injured by the "No Artificial Sweeteners" claim.  To show injury, Plaintiff relies on the expert report of J. Michael Dennis, whose conjoint survey (the "Dennis Survey") purports to show that consumers paid a "price premium" for the Bai Waters because of the presence of the "No Artificial Sweeteners" claim.  However, the Dennis Survey is unreliable, as it fails to measure any harm associated with Plaintiff's specific theory of injury—i.e., that consumers were injured by the presence of commercially-produced erythritol.  In addition, the Dennis Survey fails to replicate real-world market conditions and thus provides no evidence that the class actually paid a premium associated with the challenged claim or suffered injury.

*Fourth*, the lack of classwide proof of deception, materiality, and injury also dooms Plaintiff's individual claims, since they hinge on whether the reasonable consumer was deceived in a material way, and whether any member of the class actually paid a premium.  And while Plaintiff's individual complaint still challenges stevia leaf extract and monk fruit extract, she has no evidence that consumers believe those ingredients are artificial.

For each of these reasons, the Court should grant Bai's motion for summary judgment.

2

## II.   FACTUAL BACKGROUND

### A.   Erythritol is a naturally occurring sugar alcohol, as Plaintiff admits.

Erythritol is found in nature. It is a sugar alcohol, generally found in fruits and vegetables, like grapes, pears, and corn. *See* Statement of Undisputed Material Facts ("SUF") ¶ 1. Plaintiff agrees: she testified at her deposition that she "knew that erythritol can be found in some fruit" and "that it was a sugar alcohol." *Id.* ¶ 2. Moreover, the erythritol used in the Bai Waters comes from natural sources, namely, ███████████. *Id.* ¶ 3. ████████████████████████

████████████████████████████████████

███████████████████████ *Id.* ¶ 4.

Plaintiff had no issues with erythritol *until* she was sent materials from counsel in connection with this case. It was only upon receiving information from counsel in January 2025 about what *they* claimed to be the manufacturing process for erythritol—which Plaintiff explained as a "run through like the industrialized process and created in a factory," including "words like 'purification' and 'crystallization' and that did not read natural to me"—that Plaintiff formed a belief that erythritol is artificial. *Id.* ¶¶ 5–6.

### B.   Plaintiff contends that any sweetener is "artificial" if it is "commercially produced," even if it is derived from natural sources and occurs naturally.

Plaintiff's conceptualization of what makes a sweetener "artificial" is focused solely on the ingredient's manufacturing process, regardless of whether the ingredient is derived from natural sources or occurs naturally. *See id.* ¶¶ 7–8, 10–13. And though Plaintiff acknowledges that erythritol "could be natural" and is derived from natural sources (████████), Plaintiff claims that reasonable consumers will think that the erythritol used in the Bai Waters is artificial *solely* because it is supplied on a commercial scale as a matter of practicality and economic feasibility. *Id.* ¶¶ 2, 10–13. Under Plaintiff's definition, regardless of whether the ingredient

3

comes from a natural source and occurs in nature, if it is prepared in any type of industrial facility or factory or can be referred to as "commercially-produced" or "manufactured at scale," it is artificial. *Id.* ¶ 12.

The FDA has no definition of the term "artificial" or "natural." *See id.* ¶ 14 ("[T]he FDA has not engaged in rulemaking to establish a formal definition for the term 'natural.'"). Nor has it defined what an "artificial sweetener" is. *See id.* ¶ 15. However, the sweeteners that are traditionally considered artificial and the FDA classifies as "food additives"—like aspartame, for example—are those that do not exist in nature and are created completely in a lab. *Id.* ¶ 16. Aspartame is a molecule created in a laboratory by fusing together two amino acids— phenylalanine and aspartic acid—that do not occur together in nature. *Id.* ¶ 17.

### C.    Plaintiff's survey shows that consumers are inclined to change their minds with small differences in how the same sweetener is described.

Plaintiff hired a mock trial consultant, Chris Denove, to purportedly test whether consumers believe erythritol is "artificial." *Id.* ¶¶ 18–19. Mr. Denove has never served as an expert in a false advertising case, nor has he ever conducted a survey regarding consumer perception of food or beverage ingredients. *Id.* ¶¶ 19–20.

The Denove Survey started with descriptions of four different sweeteners, including erythritol, that were drafted by Plaintiff's counsel. *Id.* ¶ 22. The Denove Survey then asked whether consumers believed the manufacturing process described to them rendered the ingredient in question artificial or natural, after instructing consumers to focus on the manufacturing process six separate times during the brief exercise. *Id.* ¶¶ 24–25. While the results of the Denove Survey purport to show that a "majority" of respondents believe erythritol is artificial (which even Mr. Denove himself acknowledged was not a statistically significant difference from 50/50), what it in fact demonstrates is that consumers were susceptible to the manner in which the

"manufacturing process" was described to them.  *Id.* ¶¶ 26–27, 30–32.  For example, Mr. Denove ultimately had to change certain wording in his description of the cane sugar process to get his survey respondents to say what he believed was the "correct" response—that cane sugar is "natural."  *Id.* ¶¶ 31–32.  And the description Mr. Denove used for erythritol included the terms "fungus" and "fungi," terms which appear nowhere in Bai's erythritol supplier documents but that Plaintiff's counsel included in the draft description they sent to Mr. Denove.  *Id.* ¶¶ 34–36 (Mr. Flynn providing Mr. Denove with his own description of the first "general step[]" of "manufactur[ing]" erythritol, which reads: "Start with glucose, typically from cornstarch, and add specific yeast *or fungi*, which consume the glucose and excrete microbial byproducts and waste") (emphasis added); (Mr. Flynn revising the description to read, "Next, a specific yeast *or fungus* is introduced to ferment the glucose, converting it into a liquid mixture.") (emphasis added).  The Denove Survey never asked consumers what they believed the "No Artificial Sweeteners" claim to mean.  *Id.* ¶ 38.

> **D.    Plaintiff's damages survey does not isolate a price premium specific to Plaintiff's theory of liability.**

Plaintiff retained a second expert, Dr. J. Michael Dennis, to conduct a "choice-based conjoint survey" to support her claim that the phrase "No Artificial Sweeteners" commands a price premium in the marketplace.  *Id.* ¶ 39.  To do so, Dr. Dennis designed and conducted a conjoint survey, and then used the survey response data to perform a "market simulation" through a computer program called Sawtooth Software.  *Id.* ¶ 40.  Based on this market simulation, Dr. Dennis claims a single, constant price premium percentage of 4.67% attributable to the "No Artificial Sweeteners" claim.  *Id.* ¶ 41.

The conjoint survey asked respondents to select one of three hypothetical products that possessed different combinations of five attributes that Dr. Dennis deemed valuable to consumers

(namely brand, flavor, ingredients, label claims, and price) and state whether or not they would be willing to buy that product. *Id*. ¶ 43. For the price attribute, Dr. Dennis used six different price points: $1.25, $1.65, $2.05, $2.45, $2.85, and $3.25, *id*. ¶ 44, even though he admitted that "consumers tended to pay between $2.03 and $2.22 for the 18 fl. Oz. Bai Waters" and only one of his price points was within that range, *id*. ¶ 45. At the same time, Dr. Dennis omitted several label claims identified in Bai's marketing documents as important to consumers, including sustainable packaging, package size, and caffeine content. *Id*. ¶ 46. Dr. Dennis also excluded several brands that directly compete with Bai and were ranked higher in volume share than those included by Dr. Dennis. *Id*. ¶ 47. Dr. Dennis attempted to explain why he limited the number of attributes and brands, but he gave no explanation for *how* he chose which attributes and brands to include. *Id*. ¶ 48.

Dr. Dennis then performed a statistical analysis to estimate "utilities" that he claims allow him to predict the choices individuals would make if given a set of hypothetical products. *Id*. ¶ 49. Using these "utilities," Dr. Dennis conducted a series of market simulations in the Sawtooth Software program to arrive at the alleged price premium. *Id*. ¶ 50.

In the simulations, Dr. Dennis fixed the price of a hypothetical Bai product at five different price points and then set out to calculate the price at which a virtually identical (and hypothetical) Bai product, but *without* the "No Artificial Sweeteners" claim, would elicit an even split between respondents choosing between the two products—in essence, dropping the price of the hypothetical competing product until he achieved the desired 50-50 split. *Id*. ¶¶ 51–52. Dr. Dennis then calculated the price difference between each of the product pairs, which he divided by the fixed price of the product with the "No Artificial Sweeteners" claim and averaged to arrive at a single "conservative" price premium of 4.67%. *Id*. ¶ 54.

6

At his deposition, Dr. Dennis agreed that the purpose of his survey was to measure the price premium attributed to the "No Artificial Sweeteners" claim *overall*, and that he did not attempt to isolate any portion of that premium attributable to erythritol. *Id*. ¶ 59. He insisted, "it's not relevant to my assignment what the consumer perceptions are with respect to these issues." *Id*. ¶ 60.

### E. Bai's survey establishes that the challenged claim has no impact on consumer purchasing intent.

Bai engaged Dr. Itamar Simonson to conduct his own consumer perception survey. Dr. Simonson is an expert in consumer purchasing behavior and the effects of product characteristics on purchase intent. *Id*. ¶ 68. He has served as a Professor of Marketing at Stanford University for over 30 years and his testimony is routinely accepted by courts. *Id*. ¶ 69. The Simonson Survey tested three questions: (1) whether displaying the phrase "No Artificial Sweeteners" on the Bai Water label materially affected consumers' purchase likelihood; (2) whether the phrase affects the price consumers are willing to pay for a Bai Water; and (3) the level of (dis)similarity among purchasers of flavored water, such as the Bai Waters, with respect to their purchase criteria. *Id*. ¶ 70.

Dr. Simonson surveyed 511 New York State respondents in May 2025, all of whom had purchased flavored water and/or sports drinks in the preceding year and expected to purchase such products again over the next year. *Id*. ¶ 71. Dr. Simonson additionally screened out respondents who worked in advertising or public relations, market research, or for a company that makes or distributes flavored water or sports drinks. *Id*. ¶ 72.

Before seeing any stimuli (i.e., the product label) respondents were asked open-ended questions about the criteria they use in deciding whether to purchase flavored waters. *Id*. ¶ 73. Respondents were then randomly assigned to either the test group or the control group. *Id*. ¶ 74.

Both groups were shown the bottle of the Bai Waters in the Molokai Coconut flavor; the only difference was that the "No Artificial Sweeteners" phrase was removed from the bottle viewed by the control group.  *Id.* ¶ 75.  Each respondent was able to view the bottle as they would in the real world, including rotating it to see all three panels of the label.  *Id.* ¶ 76.

**Test Product**                    **Control Product**

 

8

*Id.*[1]  Respondents were then asked their likelihood of purchasing the Bai Water they were shown and how much they would be willing to pay for it.  *Id.* ¶ 77.  After doing so, respondents were asked about the criteria they used in deciding whether to purchase or not purchase the Bai Water they were shown.  *Id.* ¶ 78.

The results of the Simonson Survey were as follows: (1) omitting the phrase "No Artificial Sweeteners" from the label had no impact on the likelihood of purchase, i.e., the difference in purchase likelihood between the test and control group was not statistically significant, *id.* ¶ 79; (2) the omission of the phrase from the label did not affect the price that consumers were willing to pay, *id.* ¶ 80; (3) respondents consider a wide range of factors in deciding whether to purchase flavored waters, including flavor, taste, and cost, with only 2.7% of respondents mentioning "no artificial sweeteners" or "no artificial sugar" as a purchase consideration, and only 10% expressing a preference for natural ingredients generally (i.e., "no artificial ingredients" or no artificial flavors), *id.* ¶ 81; and (4) in general, consumers' preferences and purchase criteria for the Bai Waters vary greatly across consumers, *id.* ¶ 82.

Plaintiff did not rebut Dr. Simonson's survey.

## III.    LEGAL STANDARD

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[W]here the nonmovant will bear the ultimate burden of proof at trial on an issue, the moving party's burden under Rule 56 will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim."  *Brady v. Town of Colchester*, 863 F.2d 205, 210–11 (2d Cir. 1988) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

---

[1] The red box around the "No Artificial Sweeteners" claim in the left image above did not appear in the Simonson Survey but has been included here for illustrative purposes.

To defeat summary judgment, Plaintiff "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, Plaintiff must show that there is "significant probative evidence" on which a reasonable factfinder could decide in her favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) (quotation marks and citation omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252. Plaintiff may not rely upon "conclusory statements or mere allegations." *Davis v. New York*, 316 F.3d 93, 100 (2d Cir. 2002). Plaintiff must "go beyond the pleadings, and by . . . her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* (citing *Celotex*, 477 U.S. at 324 (1986)) (quotation marks omitted). "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Crawford v. Franklin Credit Mgmt.*, 758 F.3d 473, 486 (2d Cir. 2014) (quoting *Celotex*, 477 U.S. at 323) (quotation marks omitted).

## IV.    ARGUMENT

"To prevail [on a false advertising claim under §§ 349 and 350 of the GBL], plaintiffs must demonstrate: (1) a deceptive act; (2) materiality; and (3) injury." *In re KIND LLC "Healthy & All Natural" Litig.*, 627 F. Supp. 3d 269, 280 (S.D.N.Y. 2022), *aff'd sub nom. Bustamante v. KIND, LLC*, 100 F.4th 419 (2d Cir. 2024) ("*In re KIND*"). Plaintiff has failed to raise a genuine dispute of material fact on all three essential elements. *First*, Plaintiff fails to proffer admissible evidence showing that a reasonable consumer would be deceived by the "No Artificial Sweeteners" claim. *Second*, Plaintiff has no evidence that can show the "No Artificial Sweeteners" claim is material to consumers in purchasing the Bai Waters. *Third*, Plaintiff has failed to establish any injury to the class. *Finally*, Plaintiff's individual claims fail for all of the

10

same reasons, and also because she has no evidence reasonable consumers were deceived with respect to stevia leaf extract and monk fruit extract.

Because Plaintiff lacks sufficient evidence to survive summary judgment, Bai's motion should be granted.

**A.    The Court should grant summary judgment because Plaintiff has failed to introduce evidence that the "No Artificial Sweeteners" claim deceives consumers.**

"To survive summary judgment, Plaintiff[] must introduce evidence that could support a finding that reasonable consumers believe the plaintiff['s] proffered theory of deception." *de Lacour v. Colgate-Palmolive Co.*, No. 16-CV-8364, 2024 WL 36820, at *4 (S.D.N.Y. Jan. 3, 2024), *appeal dismissed*, No. 24-331, 2024 WL 3678389 (2d Cir. May 16, 2024) (internal citations and quotation marks omitted).  In other words, "plaintiffs must present admissible evidence establishing how the challenged statement . . . tends to mislead reasonable consumers acting reasonably." *Bustamante v. KIND, LLC*, 100 F.4th 419, 426 (2d Cir. 2024).

To do so, Plaintiff cannot merely rely on her own testimony, dubiously sourced online materials, or isolated, one-off anecdotes from individual consumers.  Rather, Plaintiff must adduce some evidence that a significant number of New York consumers are actually misled by the claim.  *See id.* (noting that "the reasonable consumer standard requires a probability that a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances, could be misled") (citing *McGinity v. Procter & Gamble Co.*, 69 F.4th 1093, 1097 (9th Cir. 2023)).

The evidence to satisfy the reasonable consumer standard comes "ordinarily in the form of a survey." *In re KIND*, 627 F. Supp. 3d at 282 (citing *Hughes v. Ester C Co.*, 330 F. Supp. 3d 862, 872 (E.D.N.Y. 2018)).  "[T]estimony about [the plaintiff's] state of mind, and hers alone, is insufficient to demonstrate what a reasonable consumer might think." *Reyes v. Upfield US Inc.*,

11

No. 22-CV-6722, 2025 WL 786656, at *9 (S.D.N.Y. Mar. 12, 2025) (collecting cases). "Plaintiff[] cannot rely on [her own] testimony to demonstrate a reasonable consumer's understanding of [the challenged claim]." *de Lacour*, 2024 WL 36820, at *6.

> **1.    Plaintiff cannot rely on the Denove Survey as evidence of consumer deception because it is biased, leading, and does not test how consumers interpret the "No Artificial Sweeteners" claim.**

The Denove Survey cannot show that reasonable consumers were deceived under Plaintiff's theory of deception, because it did not actually test how consumers interpret the phrase "No Artificial Sweeteners." The *de Lacour* case is illustrative. There, the plaintiffs alleged that the use of the term "natural" on various Tom's products was deceptive and misleading to consumers. *de Lacour*, 2024 WL 36820 at *4. The court explained that to meet the deception standard to defeat summary judgment, "Plaintiffs must offer evidence that could support a finding that a reasonable consumer understands that Tom's use of 'natural' conveys that Tom's products do not contain synthetic and/or highly chemically processed ingredients." *Id.* The plaintiffs' evidence consisted of an "expert report, governmental guidance, Named Plaintiffs' definitions, Tom's internal documents, and the testimony of Tom's employees," all of which was "either inadmissible or insufficient to establish a reasonable consumer's understanding of 'natural.'" *Id.* Plaintiff's evidence is even more inadequate and unreliable than the evidence in *de Lacour*, and should also result in summary judgment being granted.

Unlike the Denove Survey here, which is the only "evidence" upon which Plaintiff relies to show consumer deception (*see* SUF ¶ 18), the expert report in *de Lacour* did attempt to test what consumers believed was conveyed by the use of the word "natural" on Tom's products. The *de Lacour* court ultimately found the survey was "fatally flawed," however, because it "failed to provide respondents with adequate definitions of 'natural' or 'artificial,'" so "no meaningful conclusion can be drawn from respondents' answers." *de Lacour*, 2024 WL 36820 at *5.

12

Notably, the Denove Survey does not even purport to test what consumers believe "No Artificial Sweeteners" to mean, nor does it proffer any definition of "natural" or "artificial."

The Denove Survey suffers from glaring methodological errors that render it unreliable and inadmissible in the Second Circuit, and it should be excluded, as previously explained at length in the briefing of Bai's Motion to Exclude Plaintiff's Expert Chris Denove and its Reply in support thereof. *In re KIND*, 627 F. Supp. 3d at 292; *see* Dkts. 78, 90. But even if it were admissible, the Denove Survey still cannot show consumer deception, because it fails to test what consumers consider when deciding whether an ingredient is artificial. Instead of asking consumers their understanding of the "No Artificial Sweeteners" claim, the Denove Survey specifically and inappropriately primed consumers to think about the "manufacturing process" for erythritol no less than six times. *See* SUF ¶ 25. Mr. Denove assumed consumers in the real world judge the artificiality of sweeteners based on their manufacturing process without actually testing what criteria they use, including whether they consider that the sweetener occurs in nature, like erythritol does. For this reason, the Survey provides no evidence of how reasonable consumers understand the "No Artificial Sweeteners" claim or that they were deceived by it.

Additionally, the Denove Survey used leading and biased language. Mr. Denove conducted his survey knowing that respondents were sensitive to the specific words used, and that they might not understand the role of a particular unfamiliar term in the process. *Id.* ¶ 30. Indeed, Mr. Denove changed the description of "cane sugar" in the Survey after it was fielded to remove the term "calcium hydroxide" because he was not getting the results he wanted. *Id.* ¶ 32 ("Q. And so, if you include a term like 'calcium hydroxide' that consumers may not be familiar with, that can lead them to think the ingredient might be artificial; is that correct? . . . A. Yes. My belief was a small number of consumers were focusing on that term as opposed to its role, kind

of thinking it was an ingredient of."). And the final version of the Denove Survey demonstrates bias in wording choices when comparing the description used for cane sugar to that used for erythritol. *See* Dkt. 78 at 15. For example, the descriptions for cane sugar and erythritol both describe "sugarcane" as a source material. However, the description for cane sugar explains that "[t]he process begins by harvesting stalks of sugarcane," whereas the erythritol description states "[t]he process begins by taking a carbohydrate such as . . . sugarcane." SUF ¶ 33.

Moreover, Mr. Denove did not confirm that the descriptions he used for the manufacturing process of erythritol actually matched Bai's processes. *Id.* ¶ 37 ("Q. Did you consult any documentation from BAI or its suppliers about how BAI's suppliers prepare erythritol? . . . A. No."). At Plaintiff's counsel's instruction, the description Mr. Denove used states that, for erythritol, a "yeast or fungus" is used to "ferment the glucose," even though none of Bai's erythritol suppliers describe using "fungus." *Id.* ¶¶ 34–36. This alone is fatal to the reliability of his survey, which thus cannot be used to show consumer deception. *In re KIND*, 627 F. Supp. at 294 ("Where [the expert] relies on the typical or usual source of an ingredient [in his report], and not the source actually used in KIND products, his opinion has no relevance to this case.").

Surveys like the Denove Survey that are intentionally designed for the sole purpose of supporting Plaintiff's theory of liability are biased and leading and thus cannot be used to survive summary judgment. *See In re KIND*, 627 F. Supp. 3d at 288 (finding an expert survey biased and leading where the plaintiffs' expert's "survey questions were formulated with the sole purpose of supporting plaintiffs' litigation strategy"); *Bustamante*, 100 F.4th at 428–29 (affirming the district court's *In re KIND* decision, noting the expert's "concession both in his report and at his deposition that he 'worded [his] substantive response options on the basis of [his] understanding of the Plaintiffs' theory of liability'"); *see also* Plaintiff's Response to Letter-Motion to Compel

14

(Dkt. 71) at 1 (admitting that "Plaintiff's counsel drafted the initial description of the hypothetical sweetener, applying Plaintiff's theory of liability").  The Denove Survey is therefore unable to support Plaintiff's claim that consumers are deceived by the "No Artificial Sweeteners" claim.

> **2.    The remainder of Plaintiff's evidence is inadequate or inadmissible and cannot raise a genuine dispute of material fact regarding deception.**

The only other evidence Plaintiff could even try to rely upon to prove her theory of deception, such as Plaintiff's own definition in the Complaint, Plaintiff's own testimony, and (nonexistent) governmental guidance, is the same type of evidence that has failed elsewhere in this Circuit.  *See de Lacour*, 2024 WL 36820 at *6–7 (finding the plaintiffs' proffered evidence of governmental guidance, the named plaintiff's testimony, and Tom's internal documents and employee testimony insufficient to show consumer deception); *Bustamante*, 100 F.4th at 432–34 (ruling that the definition of the challenged claim pled in the complaint, the plaintiffs' own deposition testimony, KIND's internal documents, and the "ordinary dictionary definition" of the challenged claim were insufficient to show consumer deception).  Similarly, here, Plaintiff's "purported evidence fails to present any cohesive definition of what a reasonable consumer would expect from products" bearing the challenged claim.  *See Bustamante*, 100 F.4th at 432.  Plaintiff's remaining evidence offers, at best, an incoherent mix of how consumers might understand the term "No Artificial Sweeteners."

Plaintiff may offer her own testimony to support her theory that the class of consumers was deceived.  But this will not suffice.  *See Reyes*, 2025 WL 786656, at *9 (holding that "testimony about [the plaintiff's] state of mind, and hers alone, is insufficient to demonstrate what a reasonable consumer might think"); *de Lacour*, 2024 WL 36820, at *6 (holding that the plaintiff "cannot rely on [her own] testimony to demonstrate a reasonable consumer's understanding of 'natural'"); *see also Bustamante*, 100 F.4th at 433 (explaining that deposition testimony on

consumer understanding of the challenged claim "fails to create a triable issue of fact" and rather "establishes how divergent consumers' expectations can be").

Regardless, Plaintiff's testimony does not offer a coherent understanding of how consumers decide whether a sweetener is artificial:  she admits she "knew that erythritol can be found in some fruit," "that it was a sugar alcohol," and that "it could be natural."  SUF ¶ 2.  But she nonetheless believes that any sweetener that undergoes "processing" is artificial—including stevia leaf extract and cane sugar—even though Plaintiff's own flawed survey purported to show most consumers disagree with her.  *Id.* ¶ 13 ("Q. If someone were to tell you that sugar cane needed to be processed in a factory in order to be able to be put into a drink, would you consider that sugar in the drink to be a natural sweetener? . . . A. No."); *id.* (Plaintiff stating that she believes stevia extract is artificial because it "undergoes the processing and it comes up with some other, like chemical substance"); *id.* ¶¶ 28–29.  Plaintiff's suggested definition of what a reasonable consumer would consider "artificial" would encompass essentially *any* ingredient in the modern food supply that touches a factory or is produced on a commercial scale, and Plaintiff has not adduced any reliable or admissible evidence to show that a significant number of reasonable consumers agree.

In her Reply in support of her Motion for Class Certification, Plaintiff belatedly claimed that she has "adduced further evidence, including medical, academic, governmental, and journalistic references to erythritol as artificial."  *Id.* ¶ 88.  But the FDA brochure Plaintiff cited does not even reference erythritol, *see id.* ¶ 89, and in any event, the FDA has no established definition of natural or artificial, *see id.* ¶ 15; *de Lacour*, 2024 WL 36820 at *6.  The rest of Plaintiff's "evidence" is purely anecdotal and insufficient to show consumer deception.  None of the materials purport to study how reasonable consumers understand the claim "No Artificial

16

Sweeteners" or even the term "artificial." Rather, they are a smattering of articles from 2023 and 2024 concerning studies on the health implications of consuming erythritol. *See id. ¶* 90.

Plaintiff lacks any admissible evidence showing that a significant portion of New York consumers were misled by the "No Artificial Sweeteners" claim. The Court should grant summary judgment on this basis alone.

**B.    The Court should grant summary judgment because Plaintiff has failed to raise a genuine dispute of material fact that the "No Artificial Sweeteners" claim is material to consumers.**

Plaintiff also has failed to raise a genuine dispute of material fact that the No Artificial Sweeteners claim is material to consumers. *In re KIND*, 627 F. Supp. 3d at 280. "Materiality under §§ 349 and 350 of the GBL is an objective inquiry . . . ." *Id.* (citing *Maurizio v. Goldsmith*, 230 F.3d 518, 521–22 (2d Cir. 2000)). "[A] 'material claim is one that involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product.'" *In re Sling Media Slingbox Advert. Litig.*, 202 F. Supp. 3d 352, 360 (S.D.N.Y. 2016) (quoting *Bildstein v. MasterCard Int'l Inc.*, 329 F. Supp. 2d 410, 414 (S.D.N.Y. 2004)). Plaintiff has failed to proffer evidence demonstrating that the No Artificial Sweeteners claim is material to reasonable consumers—i.e., that it impacts their purchasing decisions.

**1.    Plaintiff lacks evidence to show that the "No Artificial Sweeteners" claim is material to consumers.**

Plaintiff's only evidence purporting to show that the claim is material to New York consumers is the Dennis Survey. *See* SUF ¶¶ 39, 61. As Bai has previously argued, and as discussed *infra* Section IV(C), the Dennis Survey is unreliable, and should be excluded in its entirety. *See* Bai's Motion to Exclude Plaintiff's Expert J. Michael Dennis ("Dennis Motion") (Dkt. 77); Defendant's Reply in Support of Motion to Exclude J. Michael Dennis ("Dennis Reply") (Dkt. 92). But even if the Dennis Survey is not excluded in its entirety, it does not provide

17

sufficient evidence for Plaintiff to survive summary judgment on materiality, for at least two reasons.

***First***, the Dennis Survey provides no relevant evidence of whether Plaintiff's understanding of the claim—that it promised the absence of "commercially produced" sweeteners—was material to consumers. The Dennis Survey did nothing to account for ***how*** consumers understand the challenged claim. *See* SUF ¶ 63 ("Q. You don't know how consumers in New York interpret the 'no artificial sweeteners' claim, right? A. I was not asked to do a consumer perception survey or opinion measurement or attitude measurement. I was asked to measure any economic value attributable to the challenged representation. Q. So the answer is no, correct? A. The answer is no, that's right."). Dr. Dennis was clear that "it's not relevant to my assignment what the consumer perceptions are with respect to these issues." *Id*. ¶ 60. As a result, the Dennis Survey did not demonstrate that ***Plaintiff's understanding*** of the "No Artificial Sweeteners" claim is material to consumers when deciding whether to purchase the Bai Waters.

***Second***, the Dennis Survey was intended to calculate damages in the form of a price premium—it was *not* designed to test the material importance of the claim to consumers. *Id*. ¶ 62. Nowhere in his Report does Dr. Dennis offer an opinion that the challenged claim was material to consumers' decisions to purchase the Bai Waters, or explain how consumers value the "No Artificial Sweeteners" claim compared to other claims on the Bai Waters. *Id*. ¶ 39. Unlike the Simonson Survey, for example, the Dennis Survey did not include a "test" or "control" group to isolate the significance of the "No Artificial Sweeteners" claim to consumers in deciding whether to purchase the Bai Waters. *Id*. ¶ 64. Respondents also were not shown the actual image of the Bai Water bottle (or any flavored water bottle) as it appears in reality. Instead, respondents were shown an assortment of different product attributes taken from different brands and randomly

18

mixed together.  *Id*. ¶ 66.  In no scenario were respondents presented with a choice task where they had to choose between two products where the *only* difference was the presence or absence of the "No Artificial Sweeteners" claim.  *Id.* ¶ 67.  "Absent a consumer survey or other market research to indicate how consumers reacted to the [challenged] statement[], and how they valued the[] statement[] compared to other attributes of the product . . . , Plaintiffs have not offered sufficient evidence of materiality across the class."  *In re 5-Hour Energy Mktg. & Sales Pracs. Litig.*, No. 13-ML-2438, 2017 WL 2559615, at *8 (C.D. Cal. June 7, 2017).

### 2.      Bai's evidence shows that the "No Artificial Sweeteners" claim is not material to consumers.

In fact, the only controlled study that tested whether the challenged claim on the Bai Waters is material to consumers is from Bai's expert, Dr. Simonson.  The Simonson Survey included a test group that was shown the Bai Waters with the claim and a control group that was shown the Bai Waters without the claim.  SUF ¶¶ 74–75.  There was no statistical difference in purchase likelihood between the test and control groups, demonstrating that the presence of the "No Artificial Sweeteners" claim **had no impact** on purchase intent.  *Id*. ¶ 79.  The Simonson Survey further confirmed that consumers consider a wide range of factors in deciding whether to purchase flavored waters, including flavor, taste, and cost, with only 2.7% of respondents mentioning "no artificial sweeteners or "no artificial sugar" as a purchase consideration.  *Id*. ¶ 81.

Plaintiff never submitted any expert report rebutting or criticizing Dr. Simonson.  While Plaintiff asked the Court for permission for Dr. Dennis to rebut Dr. Simonson, and the Court ordered the parties to confer in good faith on the issue, *id.* ¶ 84, Plaintiff never followed up on those discussions and has never submitted a rebuttal expert report, *id*. ¶ 85.  In a joint filing with the Court, Plaintiff also indicated she "intend[ed] to file her own motions to exclude Defendant's experts" by August 22, 2025, and the Court set a briefing schedule on those motions, *see id.* ¶ 86,

but Plaintiff failed to file any motion to exclude Dr. Simonson by that deadline, either, *id.* ¶ 87. The Simonson Survey, which remains unrebutted and unchallenged, confirms that the challenged claim is not material to consumers' decision to purchase the Bai Waters and summary judgment is appropriate.

        **C.**      **The Court should grant summary judgment because Plaintiff has failed to present evidence that raises a genuine dispute of material fact that consumers suffered any injury.**

"To succeed on a GBL claim, a plaintiff must show that they 'suffered injury as a result of the allegedly deceptive act or practice.'" *Andrews v. Sazerac Co., Inc.*, No. 23-CV-1060 (AS), 2025 WL 1808797, at *7 (S.D.N.Y. July 1, 2025) (quoting *Orlander v. Staples, Inc.*, 802 F.3d 289, 300 (2d Cir. 2015)). This element may be satisfied "by a claim that a plaintiff paid a premium for a product based on [the] defendants' inaccurate representations.'" *Id.* (quoting *Hasemann v. Gerber Prods. Co.*, 331 F.R.D. 239, 258 (E.D.N.Y. 2019)). Courts routinely grant summary judgment where "Plaintiff has not presented evidence sufficient to create an issue of material fact with respect to whether she paid a price premium." *Zakaria v. Gerber Prods. Co.*, No. 15-CV-200, 2017 WL 9512587, at *23 (C.D. Cal. Aug. 9, 2017), *aff'd*, 755 F. App'x 623 (9th Cir. 2018); *In re Gen. Motors Ignition Switch Litig.*, 407 F. Supp. 3d 212, 236 (S.D.N.Y. 2019) (granting summary judgment where the conjoint analysis failed to "provide competent proof of Plaintiffs' damages"); *see also Reyes*, 2025 WL 786656, at *9 (granting summary judgment where plaintiff "has not provided any evidence supporting a necessary element of her GBL claims—that she suffered injury" and thus "no reasonable factfinder could return a verdict in Plaintiff's favor").

In *Zakaria*, the Court held that the plaintiff did not "present[] evidence sufficient to create an issue of material fact with respect to whether she paid a price premium" because her expert's conjoint analysis was "not sufficiently tethered to actual market conditions." *Zakaria*, 2017 WL 9512587, at *23. Similarly, in *In re General Motors*, the court granted summary judgment where

the plaintiffs' expert's conjoint analysis failed to account for real-world supply side factors and thus was "insufficient to stave off summary judgment." 407 F. Supp. 3d at 240. The court found the flawed conjoint analysis was only capable of measuring "consumers' private valuations (on average) of certain hypothetical GM vehicles sold with fully disclosed defects; it [did] not measure the market value of those vehicles." *Id.* at 236.

Here, as in *Zakaria* and *In re General Motors*, Plaintiff attempts to show injury through her expert's conjoint analysis (the Dennis Survey), which purports to show that consumers pay a premium for the challenged claim. But the Dennis Survey fails to show the class suffered any injury for two key reasons.

*First*, the Dennis Survey does not match Plaintiff's theory of liability, and therefore cannot provide evidence that any premium was paid in connection with the allegedly misleading interpretation of "No Artificial Sweeteners." *See* Dennis Motion at 6–11; Dennis Reply at 2–6. Plaintiff contends that consumers believe a sweetener is artificial if it is "commercially-produced" or "manufactured at scale," even if it can also be found in nature. *See* SUF ¶ 12. She argues that the erythritol in Bai is commercially produced, and as a result, the class was injured by the presence of commercially-produced erythritol in the Bai Waters. *See id.* ¶¶ 10–12.

Dr. Dennis's Survey, however, purports to measure a price premium associated with the "No Artificial Sweeteners" claim *overall* and does not test Plaintiff's theory of how the class was injured. "Under *Comcast*, [a damages expert] must be able to isolate the price premium associated with misleading consumers in th[e] particular fashion" alleged by the Plaintiff. *See In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 1024 (C.D. Cal. 2015). In *ConAgra*, the court rejected a conjoint survey where "[the expert] focuses solely on the 'price premium' attributable to the '100% Natural' label; he makes no effort to segregate the price premium attributable to a consumer's

21

understanding that '100% Natural' means the cooking oils contain no genetically modified organisms.'" *Id.*

Likewise, here, Dr. Dennis does not isolate the premium associated with Plaintiff's understanding of the claim, as opposed to other understandings of the claim that Plaintiff does not allege are untruthful (like the absence of sweeteners that are created completely in a lab, such as aspartame). This is fatal. *See, e.g.*, *Opperman v. Kong Techs., Inc.*, No. 13-CV-00453, 2017 WL 3149295, at *12 (N.D. Cal. July 25, 2017) (rejecting proposed conjoint analysis concerning claim that devices were "secure," because it "would measure the value consumers attribute to security broadly, despite the focus of Plaintiffs' theory of liability on only two failed security features"); *In re 5-Hour Energy Mktg. & Sales Practices Litig.*, 2017 WL 2559615, at *9, 11 (excluding plaintiffs' damages model where they "offered no evidence that any one definition of [the 5-hour ENERGY claim] prevails among all consumers" and failed to "isolate the specific premium paid for five hours of caloric energy").

***Second***, the design of Dr. Dennis's conjoint survey and market simulation fail to mirror real-world conditions and thus fail to establish the class suffered any injury at all. Specifically:

- In his survey, Dr. Dennis failed to use real-world market prices for the Bai Waters. Instead, Dr. Dennis inappropriately used prices of ***competitor products*** (for which he provided no evidentiary support), which contradicts both established caselaw precedent and statements Dr. Dennis made in his own Report. And even the competitor prices Dr. Dennis purports to have considered do not support the price points used in his survey. Dennis Motion at 13–14; Dennis Reply at 7–8; SUF ¶¶ 55–56.

- Dr. Dennis's market simulation failed to include competitor products and thus failed to properly reflect actual market choices available to consumers, contradicting guidance from the very software program he used. In his simulation, Dr. Dennis then used a 50-50 split to calculate the purported price premium, which is inconsistent with principles of supply and demand, and completely arbitrary and unreliable as a result. Dennis Motion at 14–15; Dennis Reply at 8–9; SUF ¶¶ 52, 57–58.

22

- Dr. Dennis's survey is further unreliable because it omitted direct competitor products that have higher market share than the ones he used, and arbitrarily omitted product attributes that Bai's documents state are important to consumers. Dennis Motion at 15–17; Dennis Reply at 9–10.  SUF ¶¶ 46–47.

- Finally, Dr. Dennis's use of a single, constant price premium across the class is neither reliable nor realistic because it does not account for real-world variations in prices across package sizes, sales channels, retailers, geographic locations, or promotional activities.  Dennis Motion at 17; Dennis Reply at 10–11; SUF ¶¶ 41–42.

For each of these reasons, Dr. Dennis's conjoint survey and market simulations fail to reflect real-world market conditions and are too divorced from the marketplace to accurately calculate any price premium.  *See Zakaria,* 2017 WL 9512587, at *20 (rejecting conjoint analysis as "not sufficiently tethered to actual market conditions").  Plaintiff has therefore set forth no evidence of injury, and summary judgment should be granted on this basis alone.  *See Reyes*, 2025 WL 786656, at *9.

**D.    The Court should grant summary judgment on Plaintiff's individual claims.**

In addition to granting summary judgment on Plaintiff's claims on behalf of the class, this Court should also grant summary judgment on Plaintiff's individual claims.  *First*, Plaintiff's individual claims fail for the same reasons the class claims fail.  Even for Plaintiff's individual claims, Plaintiff must still show the objective "reasonable consumer" would be deceived, not just that she herself was individually misled.  *See Rivera v. Navient Solutions, LLC*, No. 20-CV-1284, 2020 WL 4895698, at *10 (S.D.N.Y. Aug. 19, 2020) ("A Section 349 claim asks whether the language . . . would have been . . . misleading to a reasonable consumer, and not to the plaintiff before the Court based on his or her own idiosyncratic facts.").  For her individual claims, Plaintiff must also show the challenged claim was material to reasonable consumers (not just herself) and that she suffered a cognizable injury by paying a price premium.  *See id*; *Reyes*, 2025 WL 786656, at *7 ("'[A] plaintiff must prove 'actual' injury to recover under the statute.'") (quoting *Colpitts*

23

*v. Growers*, No. 20-CV-2487, 2023 WL 2752161, at \*3 (S.D.N.Y. Mar. 31, 2023)). Because Plaintiff cannot establish these elements for the class, her individual claims likewise fail.

*Second*, Plaintiff has no evidence to show that reasonable consumers would believe *monk fruit extract* and *stevia leaf extract* are artificial. While Plaintiff did not move for class certification on these sweeteners, they are still identified in her live Complaint. *See* SUF ¶ 9. The only evidence Plaintiff could put forward on this point would be the Denove Survey. Notably, the Denove Survey did not test monk fruit extract at all. *Id.* ¶ 23. And while the Denove Survey suffers from its own fatal flaws and bias, the results purport to show that the consumers surveyed *did not believe* stevia leaf extract was an artificial sweetener. *Id.* ¶ 29 (approximately 90% of respondents believed stevia leaf extract should be labeled as a "natural" rather than "artificial" sweetener). The Court should therefore grant summary judgment on Plaintiff's individual claims.

## V.    CONCLUSION

Defendant respectfully requests that the Court grant summary judgment both as to the class claims and to Plaintiff's individual claims.

24

DATED:  September 26, 2025

Respectfully submitted,

**BAKER BOTTS L.L.P.**

By: */s/ Cheryl A. Cauley*
    Cheryl A. Cauley (*pro hac vice*)
    BAKER BOTTS L.L.P.
    1001 Page Mill Road
    Building One, Suite 200
    Palo Alto, CA 94304-1007
    Tel: (650) 739-7557
    cheryl.cauley@bakerbotts.com

    Monica H. Smith (*pro hac vice*)
    BAKER BOTTS L.L.P.
    2001 Ross Avenue, Suite 900
    Dallas, TX 75201-2980
    Tel: (214) 953-6929
    monica.smith@bakerbotts.com

    Christina A. Romak
    BAKER BOTTS L.L.P.
    30 Rockefeller Plaza
    New York, NY 10112-4498
    Tel: (212) 408-2663
    christina.romak@bakerbotts.com

    *Attorneys for Defendant Bai Brands, LLC*

## CERTIFICATE OF COMPLIANCE

The undersigned certifies that the foregoing contains 7,642/8,750 words, excluding the parts of the document that are exempted by Local Civil Rule 7.1(c).  The undersigned relied on the word count of the word-processing program used to prepare this document.


DATED:  September 26, 2025                  */s/ Cheryl A. Cauley*
                                             Cheryl A. Cauley